**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| ERIC LEE KELLEY,<br><br>Plaintiff,<br><br>vs.<br><br>JEROME TILLER, in his individual capacity; CHARLIE W. MINNEHAN, in his individual capacity; ELEANOR H. LADD, in her individual capacity; TREY POTTORFF, in his individual capacity; and CITY OF DES MOINES, IOWA,<br><br>Defendants. | Case No. 4:26-cv-366<br><br>**COMPLAINT AND JURY DEMAND** |

**COMES NOW** the Plaintiff, Eric Lee Kelley, by and through his attorney, Robert G. Rehkemper, and for his Complaint and Jury Demand against the Defendants, states the following:

## JURISDICTION AND VENUE

1. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

2. This Court has supplemental jurisdiction over Plaintiff's Iowa common law and statutory claims pursuant to 28 U.S.C. § 1367(a), because those claims arise out of the same case or controversy as the federal claims alleged herein.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because one or more of the Defendants resides in this District and because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred within this District.

4. Assignment to the Central Division is proper because the events giving rise to this action occurred in Des Moines, Polk County, Iowa.

5. Plaintiff's causes of action against all Defendants concern violations of his constitutional rights and personal liberties and are brought, to the extent applicable, pursuant to 42 U.S.C. § 1983, the common law, and/or Chapter 670 of the Iowa Code ("Municipal Tort Claims Act").

6. Plaintiff seeks reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b).

**PARTIES**

7. Plaintiff Eric Lee Kelley ("Kelley") is a citizen of the United States and was at all times relevant hereto a resident of Des Moines, Polk County, Iowa.

8. Defendant Jerome Tiller ("Tiller") is a citizen of the United States and is, upon information and belief, a resident of the State of Iowa.

9. At all times relevant hereto, Tiller was a certified peace officer and a certified canine handler employed by the Des Moines Police Department, acting within the scope of his employment with the City of Des Moines and under color of state law.

10. Defendant Charlie W. Minnehan ("Minnehan") is a citizen of the United States and is, upon information and belief, a resident of the State of Iowa.

11. At all times relevant hereto, Minnehan was a certified peace officer employed by the Des Moines Police Department, acting within the scope of his employment with the City of Des Moines and under color of state law.

12. Defendant Eleanor H. Ladd ("Ladd") is a citizen of the United States and is, upon information and belief, a resident of the State of Iowa.

13. At all times relevant hereto, Ladd was a certified peace officer employed by the Des Moines Police Department, acting within the scope of her employment with the City of Des Moines and under color of state law.

14. Defendant Trey Pottorff ("Pottorff") is a citizen of the United States and is, upon information and belief, a resident of the State of Iowa.

15. At all times relevant hereto, Pottorff was a certified peace officer employed by the Des Moines Police Department holding the rank of Sergeant, acting within the scope of his employment with the City of Des Moines and under color of state law.

16. At all times relevant hereto, Pottorff was the ranking and supervising officer present at the scene of the incident described herein, held supervisory authority over the other officers present, and had previously served as Minnehan's Field Training Officer.

17. Defendant City of Des Moines, Iowa ("Des Moines" or the "City") is a municipal corporation organized and existing under the laws of the State of Iowa, acting under color of state law, and operating the Des Moines Police Department.

18. Tiller, Minnehan, Ladd, and Pottorff are referred to collectively herein as the “Defendant Officers.” Each of the Defendant Officers is sued in his or her individual capacity.

19. As certified peace officers, each of the Defendant Officers had the legal obligation to act in conformity with the United States and Iowa Constitutions and other applicable federal and state law.

20. At all times material hereto, each of the Defendant Officers was acting within the scope and course of his or her employment as a peace officer with the Des Moines Police Department and under color of state law.

## FACTUAL ALLEGATIONS

### The Traffic Stop

21. On October 9, 2024, in the early morning hours, officers of the Des Moines Police Department conducted a traffic stop of a vehicle near the intersection of SW 9th Street and McKinley Avenue in Des Moines, Polk County, Iowa.

22. The stated bases for the stop were the absence of a front license plate and the lack of a functioning rear license plate light.

23. Kelley was the front-seat passenger in the vehicle that was the subject of the traffic stop.

24. In addition to Kelley, the vehicle was occupied by a driver and at least one other passenger seated in the rear of the vehicle.

25. Neither the absence of a front license plate nor an inoperative rear license plate light is an offense for which Kelley, as a passenger, could have been arrested.

26. The officers' initial investigation at the scene concerned the identity of another occupant of the vehicle, and not Kelley.

27. Defendant Officers Tiller, Minnehan, Ladd, and Pottorff were among the officers present at the scene of the stop.

28. Tiller was a certified Des Moines Police Department canine handler and was accompanied at the scene by his police service dog, Draco.

**The Initial Use of Force**

29. During the course of the encounter, and for the stated reason that he was non-compliant, officers undertook to take Kelley into custody.

30. Kelley was not suspected of having committed any violent offense.

31. During the initial moments of the officers' effort to take Kelley into custody, a physical struggle ensued.

32. During the struggle, multiple officers brought Kelley to the ground.

33. During the incident, Minnehan punched Kelley in the back of the head four or five times.

34. During the incident, Minnehan was verbally instructed and encouraged in his application of force by Pottorff, his former Field Training Officer and the ranking officer present at the scene.

**Kelley's Surrender**

35. Kelley thereafter ceased any and all resistance.

36. At the direction of the Defendant Officers, and at gunpoint, Kelley lowered himself into a prone position on the roadway.

37. At the direction of the Defendant Officers, Kelley interlocked his fingers behind his head.

38. Kelley was unarmed.

39. Once prone on the roadway with his fingers interlocked behind his head, Kelley was surrendered, compliant, and posed no threat of harm to the officers or to any other person.

40. The Defendant Officers were equipped with and activated body-worn cameras during the incident, which recorded the events described herein.

41. A body-worn camera screen capture bearing a timestamp of 05:58:50 on October 9, 2024, depicts Kelley lying prone on the roadway with his fingers interlocked behind his head, surrounded by officers who had their firearms drawn and pointed at Kelley:



42. Kelley remained motionless in the position depicted above until he was bitten by the canine.

**The Canine Deployment**

43. While Kelley lay face down on the roadway, motionless, with his fingers interlocked behind his head as instructed by the officers, Tiller directed Draco to bite Kelley.

44. Body-worn camera footage reflects that Draco began biting and holding Kelley at a timestamp of 05:58:58, approximately eight (8) seconds after Kelley was depicted prone, motionless, and surrendered.

45. Draco bit and held the back of Kelley's right leg.

46. No intelligible warning that a police service dog would be deployed was given to Kelley at any time before Tiller directed Draco to bite him.

47. It was feasible for Tiller to give such a warning before directing Draco to bite Kelley.

48. Tiller directed Draco to bite Kelley notwithstanding that Kelley had ceased all resistance, was prone and motionless, was unarmed, had his fingers interlocked behind his head, and was surrounded by multiple armed officers at gun point.

49. Tiller thereafter permitted Draco to continue biting and holding Kelley while officers directed profanities at Kelley and yelled conflicting instructions at him.

50. The bite and hold continued until Tiller physically forced Draco's jaws to release at a timestamp of 05:59:35.

51. Draco bit and held Kelley for approximately thirty-seven (37) seconds, the entirety of which occurred after Kelley had surrendered, ceased resisting, and assumed a prone and motionless position on the roadway.

52. Tiller did not call Draco off. The bite ended only when Tiller pried the dog's jaws from Kelley's leg.

53. During the deployment, Draco also "nipped" Ladd, reflecting that the dog was deployed at close quarters and was not under adequate control.

54. Upon information and belief, Draco had a documented history of uncontrolled, unwarranted, and/or unintended bites prior to October 9, 2024, which was known or should have been known to Tiller and to the City.

55. The deployment and continued application of the canine bite against Kelley after he had surrendered and ceased resisting served no legitimate law-enforcement purpose.

56. The force used against Kelley after his surrender was objectively unreasonable, unnecessary, and excessive under the totality of the circumstances.

57. A reasonable officer in the position of each of the Defendant Officers would have known that deploying, maintaining, or permitting a canine bite upon a surrendered, prone, unarmed, and motionless arrestee was unlawful.

58. Minnehan, Ladd, and Pottorff were present and participating in the seizure of Kelley at the time of the canine bite, were positioned within a few feet of Kelley, observed the canine bite and hold, and had both the authority and a reasonable

opportunity to intervene to prevent or to stop the unjustified use of force, but failed to do so.

59. Pottorff, as the ranking officer on scene and a Sergeant with supervisory authority over the officers present, possessed the authority and a reasonable opportunity to order that the use of force against Kelley cease, but failed to do so.

**Kelley's Injuries**

60. The canine bite tore a gash in Kelley's right leg that required six surgical staples to close.

61. Kelley required emergency medical treatment for the canine bite wound.

62. As a result of the canine bite, Kelley sustained permanent physical scarring and disfigurement to his right leg, as well as ongoing psychological and emotional harm.

**The Officers' Post-Incident Statements**

63. Following the incident, the Defendant Officers were laughing and recounting their exploits to one another, all of which was captured on body-worn cameras.

64. Ladd commented, "You really worked him over," with a big smile on her face.

65. Minnehan repeatedly bragged about punching Kelley in the back of his head.

66. Minnehan stated, "I was nonchalant as I was punching his [Kelley's] head."

67. Ladd later commented, "it was awesome," and then stated, "it's like we tell the kids [referring to young officers], it aint always pretty but here we are."

68. Minnehan verbalized that he was going to use the incident as a teaching example for young officers in field training.

69. Tiller admitted to other officers that Kelley was laying prone, face down on the ground with his hands behind his head, when he "walked" Draco in for the bite.

70. None of the Defendant Officers reported the use of force against Kelley as improper, excessive, or contrary to Des Moines Police Department policy.

71. The Defendant Officers' contemporaneous statements reflect their understanding that the force used against Kelley was consistent with what the Des Moines Police Department expected of its officers and was of a kind suitable to be taught to new officers as a model of appropriate practice.

**Disposition of the Criminal Charges**

72. While Kelley was charged and convicted of various controlled substance related offenses arising out of the incident, the accusations of interference with official acts and harassment of a public official were all dismissed.

73. Kelley was not convicted of any criminal offense arising out of this incident related to resisting arrest, assault on peace officers, or any other offense related to unlawful interference or resistance to an arrest or law enforcement's orders and commands.

74. This action does not challenge the validity of any conviction or sentence, and no judgment in Kelley's favor would imply the invalidity of any conviction or sentence.

75. The force complained of in this Complaint is temporally and factually distinct from any conduct by Kelley preceding his surrender. Kelley's claims are directed solely at the force applied to him after he ceased all resistance, assumed a prone

position on the roadway, interlocked his fingers behind his head, and posed no threat to any person.

**DAMAGES COMMON TO ALL COUNTS**

76. As a direct and proximate result of the conduct of the Defendants described herein, Kelley has suffered and will continue to suffer the following damages:

- Bodily injury, including a canine bite laceration to the right leg requiring six surgical staples;
- Permanent scarring and disfigurement;
- Past and future physical and mental pain and suffering;
- Past and future medical expenses;
- Deprivation of his constitutional rights and personal liberties;
- Attorney fees and costs; and
- Other incidental out-of-pocket expenses.

**LAW COMMON TO ALL COUNTS**

77. At all times material hereto, each of the Defendant Officers was acting under color of state law within the meaning of 42 U.S.C. § 1983.

78. The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, guarantees the right to be free from unreasonable seizures, including the right to be free from the use of excessive force in the course of a seizure. *Graham v. Connor*, 490 U.S. 386 (1989).

79. The reasonableness of the force used is judged from the perspective of a reasonable officer on the scene, in light of the facts and circumstances confronting

the officer, including the severity of the crime at issue, whether the individual posed an immediate threat to the safety of the officers or others, and whether the individual was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

80. At all times material hereto, the law was clearly established in this Circuit that the use of objectively unreasonable or excessive force by a law enforcement officer in the course of a seizure violates the Fourth and Fourteenth Amendments to the United States Constitution.

81. At all times material hereto, the law was clearly established in this Circuit that an arrestee who has ceased resisting and surrendered has a constitutional right to be free from the further or continued use of force. *See Blazek v. City of Iowa City*, 761 F.3d 920 (8th Cir. 2014); *Small v. McCrystal*, 708 F.3d 997 (8th Cir. 2013); *Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006).

82. At all times material hereto, the law was clearly established in this Circuit that the deployment of a police service dog to bite an individual who has ceased resisting and poses no threat, and the failure to give a feasible warning before deploying a police service dog, may constitute objectively unreasonable force in violation of the Fourth Amendment. *See Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2003).

83. At all times material hereto, the law was clearly established in this Circuit that a law enforcement officer who is present at the scene and fails to intervene to prevent or to stop the use of excessive force by a fellow officer, when that officer

had a reasonable opportunity to do so, is liable under 42 U.S.C. § 1983 for the resulting deprivation. *See Krout v. Goemmer*, 583 F.3d 557 (8th Cir. 2009); *Putman v. Gerloff*, 639 F.2d 415 (8th Cir. 1981).

84. The foregoing law was clearly established as of October 9, 2024, placing each of the Defendant Officers on fair notice that the conduct described above violated Kelley's clearly established constitutional rights.

**DIVISION I**
**Fourth and Fourteenth Amendment (42 U.S.C. § 1983) - Excessive Force**
**Canine Deployment - Defendant Tiller**

85. Kelley incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

86. Tiller's deployment of Draco against Kelley constituted a seizure of Kelley's person within the meaning of the Fourth Amendment.

87. Tiller's direction that Draco bite Kelley, after Kelley had surrendered, assumed a prone position, interlocked his fingers behind his head, and when Kelley was unarmed and posed no threat to the officers or to others, was objectively unreasonable and violated Kelley's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

88. Tiller's continued application of the canine bite for approximately thirty-seven seconds, and his failure to call Draco off at any point during that period, was objectively unreasonable and violated Kelley's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

89. Tiller's failure to give a intelligible warning before directing Draco to bite Kelley, when it was feasible to do so, was objectively unreasonable and violated Kelley's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

90. No reasonable officer in Tiller's position could have believed that directing a police service dog to bite a surrendered, prone, unarmed, and motionless arrestee, without warning, was lawful under the clearly established law set forth above.

91. As a direct and proximate result of Tiller's conduct, Kelley suffered irreparable injury to his constitutional rights and personal liberties guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and the damages set forth above.

92. Tiller's conduct was undertaken with evil motive or intent, and/or with reckless and callous indifference to Kelley's federally protected rights, justifying an award of exemplary, punitive damages against Tiller. *Smith v. Wade*, 461 U.S. 30 (1983).

93. Kelley seeks compensatory damages and punitive damages against Tiller, together with reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b).

## DIVISION II
### Fourth and Fourteenth Amendment (42 U.S.C. § 1983) - Excessive Force Strikes to the Head - Defendant Minnehan

94. Kelley incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

95. Minnehan's application of physical force against Kelley constituted a seizure of Kelley's person within the meaning of the Fourth Amendment.

96. Minnehan's act of punching Kelley four or five times in the back of the head, while Kelley was on the ground and physically controlled by multiple officers, was objectively unreasonable under the totality of the circumstances and violated Kelley's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

97. Kelley was not suspected of a violent offense, was unarmed, and the strikes to his head were grossly disproportionate to any threat he presented.

98. Minnehan's own contemporaneous admission that he was "nonchalant" while punching Kelley's head confirms that the strikes were not a measured or necessary response to any perceived threat.

99. No reasonable officer in Minnehan's position could have believed that repeatedly striking a grounded, unarmed arrestee in the back of the head was lawful under the clearly established law set forth above.

100. As a direct and proximate result of Minnehan's conduct, Kelley suffered irreparable injury to his constitutional rights and personal liberties guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and the damages set forth above.

101. Minnehan's conduct was undertaken with evil motive or intent, and/or with reckless and callous indifference to Kelley's federally protected rights, justifying an award of exemplary, punitive damages against Minnehan. *Smith v. Wade*, 461 U.S. 30 (1983).

102. Kelley seeks compensatory damages and punitive damages against Minnehan, together with reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b).

## DIVISION III
## Fourth and Fourteenth Amendment (42 U.S.C. § 1983) - Failure to Intervene
## Defendants Minnehan, Ladd, and Pottorff

103. Kelley incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

104. Each of them, Minnehan, Ladd, and Pottorff, were present at the scene, within a few feet of Kelley, and observed Kelley surrender, assume a prone position on the roadway, and interlock his fingers behind his head.

105. Each of them, Minnehan, Ladd, and Pottorff, observed Tiller direct Draco to bite Kelley and observed Draco bite and held Kelley for approximately thirty-seven seconds thereafter.

106. Each of them, Minnehan, Ladd, and Pottorff, knew that the deployment and continued application of the canine bite against a surrendered, prone, unarmed, and motionless arrestee was unlawful.

107. Each of them, Minnehan, Ladd, and Pottorff, had a reasonable opportunity to intervene to prevent or to stop the unlawful use of force against Kelley.

108. Each of them, Minnehan, Ladd, and Pottorff, failed to intervene, and instead permitted the unlawful use of force to continue for approximately thirty-seven seconds.

109. Ladd additionally failed to intervene to prevent or to stop Minnehan's repeated strikes to the back of Kelley's head, when she had a reasonable opportunity to do so.

110. The failure of Minnehan, Ladd, and Pottorff to intervene was objectively unreasonable and deprived Kelley of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

111. As a direct and proximate result of the failure of Minnehan, Ladd, and Pottorff to intervene, Kelley suffered irreparable injury to his constitutional rights and personal liberties and the damages set forth above.

112. The conduct of Minnehan, Ladd, and Pottorff was undertaken with evil motive or intent, and/or with reckless and callous indifference to Kelley's federally protected rights, justifying an award of exemplary, punitive damages against each of them. *Smith v. Wade*, 461 U.S. 30 (1983).

113. Kelley seeks compensatory damages and punitive damages against Minnehan, Ladd, and Pottorff, together with reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b).

**DIVISION IV**
**Fourth and Fourteenth Amendment (42 U.S.C. § 1983) - Supervisory Liability**
**Defendant Pottorff**

114. Kelley incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

115. Pottorff was the ranking and supervising officer present at the scene, holding the rank of Sergeant, with supervisory authority over each of the other officers

present, including Minnehan, whom he had previously trained as a Field Training Officer.

116. Pottorff verbally instructed and encouraged Minnehan in the application of force against Kelley, and thereby directly participated in and proximately caused the deprivation of Kelley's constitutional rights.

117. Pottorff was personally present for, and observed, the entirety of the force used against Kelley, including the strikes to Kelley's head and the canine bite and hold.

118. Pottorff was aware of facts from which the inference could be drawn that a substantial risk of unconstitutional force against Kelley existed, and he drew that inference.

119. Pottorff demonstrated deliberate indifference to, and gave tacit authorization of, the unconstitutional use of force against Kelley by failing to order that the force cease, by failing to intervene, by failing to report the force as improper or excessive, and by failing to take any corrective action.

120. Pottorff's conduct was objectively unreasonable and proximately caused the deprivation of Kelley's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

121. As a direct and proximate result of Pottorff's conduct, Kelley suffered irreparable injury to his constitutional rights and personal liberties and the damages set forth above.

122. Pottorff's conduct was undertaken with evil motive or intent, and/or with reckless and callous indifference to Kelley's federally protected rights, justifying an award

of exemplary, punitive damages against Pottorff. *Smith v. Wade*, 461 U.S. 30 (1983).

123. Kelley seeks compensatory damages and punitive damages against Pottorff, together with reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b).

## DIVISION V
## Municipal Liability (42 U.S.C. § 1983 - *Monell*)
## Pattern and Practice of Force Against Surrendering Arrestees
## Defendant City of Des Moines

124. Kelley incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

125. The violation of Kelley's constitutional rights and the resulting damages were directly and proximately caused by the policies, customs, practices, and/or deliberately indifferent failures to train, supervise, and discipline of Defendant City of Des Moines, acting by and through the Des Moines Police Department. *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

126. Des Moines, by and through the Des Moines Police Department, has engaged in a policy, pattern, practice, and/or custom of authorizing, encouraging, and/or tolerating the use of force against arrestees who initially resist being taken into custody, but who then cease resisting and surrender.

127. Des Moines, by and through the Des Moines Police Department, has engaged in a policy, pattern, practice, and/or custom of failing to require its officers to cease, disengage, or call off the use of force once an arrestee has surrendered and ceased resisting.

**The Pattern of Force Against Restrained and Surrendered Persons**

128. The Des Moines Police Department's continuing, widespread, and persistent pattern and practice of using force against restrained and surrendered individuals is demonstrated by, among other things, the following publicly reported incidents:

a. September 2008: Octavius Bonds and Erin Evans were assaulted by Des Moines Police Officers Mersed Dautovic and John Mailander, who repeatedly struck both individuals with their City-issued ASP batons after they had ceased any arguable resistance. The Des Moines Police Department did not take remedial measures until after the officers were investigated by federal authorities, which ultimately led to their indictment and conviction on federal civil rights excessive-force offenses.[1] The City of Des Moines settled the resulting civil claim for $500,000, yet the practices continued. *Bonds v. City of Des Moines*, No. 4:09-cv-00131-RP-CFB (S.D. Iowa).

b. February 2013: Orville Hill was assaulted by Officer Colin Boone while Hill was lying face down and restrained by other officers. Officer Boone was indicted and convicted of federal civil rights violations for excessive use of force.[2] Officer Boone had a reported history of prior assaultive

[1] https://www.prisonlegalnews.org/news/2012/may/15/excessive-force-by-des-moines-police-officers-leads-to-proposed-settlement-of-500000/

[2] https://apnews.com/e90beb90ec4d4c518fcf0818a92f6d91

behavior against an arrestee who had previously been resistive, which was covered up by a fellow officer and went unremedied by Des Moines Police Department leadership. The City of Des Moines settled the resulting civil lawsuit in 2016 for $250,000, yet the practices continued.

c. February 2013: Dustin Burnikel was assaulted by Des Moines Police Officers after he had been pepper sprayed and subdued. The officers handcuffed Burnikel before lifting him off of the ground and dropping him face first onto the concrete. Both officers had a reported history of disciplinary action for previously striking handcuffed and restrained individuals. In 2018, a federal jury in this District found that Officers Michael Fong and Greg Wessels used excessive force against Burnikel and committed battery, and the case ultimately settled for $800,000, yet the practices continued.[3] *Burnikel v. Fong*, No. 4:15-cv-00050-JAJ-HCA (S.D. Iowa); and *Burnikel v. Fong*, 886 F.3d 706 (8th Cir. 2018).

d. February 2018: Khy'La Williams, then seventeen years old, was pepper sprayed and thrown to the ground by Des Moines Police Officer Greg Wessels, the same officer involved in the Burnikel matter, at the DART bus station. The claim settled in 2020 for $75,000, yet the practices continued. Officer Wessels continued to work as an active officer for the Des Moines Police Department despite multiple disciplinary actions for striking

[3] https://apnews.com/article/5c513b4ed80a4629890104695297bf14

restrained citizens, until he finally resigned amid an investigation into inappropriate comments he made during a union meeting.[4]

e. June 2020: Journalist Mark "Ted" Nieters was tackled to the ground from behind and pepper sprayed in the eyes by Des Moines Police Officer Brandon Holtan while Nieters was not resisting and was physically restrained, and despite Nieters having been visually and verbally identified as a member of the press. The case settled for $100,000, yet the practice of using force against restrained individuals continued.[5]

129. Each of the foregoing incidents involved the use or continuation of force against an individual who had surrendered, ceased resisting, and/or been physically restrained, placing the City of Des Moines on actual or constructive notice of the pattern and practice described herein.

130. The foregoing incidents were not isolated. They span more than sixteen years, involve multiple officers, multiple units, and three successive Chiefs of Police, and reflect a continuing, widespread, and persistent pattern of unconstitutional conduct that remained in effect on October 9, 2024.

131. Upon information and belief, additional incidents, citizen complaints, internal-affairs investigations, and internal-affairs findings occurring in the years

---

[4] https://www.kcci.com/article/des-moines-iowa-police-investigate-greg-wessels-resigns-amid-investigation/36077091

[5] https://pressfreedomtracker.us/all-incidents/independent-photojournalist-sues-following-arrest-assault-at-des-moines-protest/

immediately preceding October 9, 2024, will reflect the same pattern and will be identified through the formal discovery process.

**The City's Ratification of Excessive Force and Promotion of Offending Officers**

132. Despite actual and constructive notice of the pattern described above, the City failed to retrain, supervise, discipline, or terminate the officers responsible, and in several instances instead retained or promoted them, thereby ratifying and perpetuating the unconstitutional pattern and practice.

133. The City of Des Moines has a corresponding pattern and practice of promoting officers who have used excessive force against restrained individuals and of placing those officers in positions of leadership over new and younger officers, thereby encouraging, facilitating, and promoting a department-wide culture of unconstitutional use of force.

134. The City of Des Moines' pattern and practice described above is exemplified by its treatment of Officer Greg Wessels, who was disciplined at least nine times over the course of his career, under three successive Chiefs of Police.

135. In May of 2008, Wessels was verbally reprimanded for taking a handcuffed suspect to the ground, causing physical injuries.[6]

[6] https://iowacapitaldispatch.com/2020/07/03/a-des-moines-police-sergeant-has-a-history-of-excessive-force-protesters-ask-why-is-he-still-there/

136. One month later, in June of 2008, Wessels was given a one-day suspension for punching a handcuffed prisoner and taking him to the ground, also resulting in physical injuries to that individual. *Id.*

137. Notwithstanding these documented incidents, Wessels was promoted from senior officer to sergeant in 2012, assuming a supervisory rank in which he would evaluate and direct other officers' uses of force. *Id.*

138. In February of 2013, Wessels, along with Officer Fong, was found by a jury in this District to have used excessive force and committed battery when they lifted and dropped Dustin Burnikel, who was handcuffed, face first onto concrete.

139. In 2014, Wessels used his service weapon to shoot out the tire of a fleeing minivan and was reprimanded by then, Major Dana Wingert, who later served as Chief of the Des Moines Police Department from 2015 to 2024. *Id.*

140. Just months later in 2014, Wessels received a four-day suspension for punching a handcuffed prisoner in the jaw, documented by way of prisoner transport vehicle video, which neither he nor his fellow officers reported. *Id.*

141. In February of 2018, Wessels pepper sprayed and threw seventeen-year-old Khy'La Williams to the ground at the DART station, resulting in the 2020 settlement described above.

142. Even after all of the aforementioned documented incidents, Wessels remained employed as a sergeant, overseeing the detective unit, and received positive performance reviews that included praise for being "compassionate."[7]

143. Wessels was also publicly praised by the Des Moines Police Department after the Williams incident became public, being described as "a respected 31-year veteran who had served in nearly every unit within the department."[8]

144. The City's ratification, public commendation, and promotion of officers with a documented history of using excessive force was not limited to Officer Wessels.

145. Officer Michael Fong was disciplined in 2007 for striking a handcuffed citizen.

146. Following the 2018 adverse federal jury verdict finding that he used excessive force and committed battery, Fong continued to work for the Des Moines Police Department in the vice and narcotics control section before later being assigned to teach, of all subjects, de-escalation at the Des Moines Regional Police Academy.

147. In April of 2026, after the incident described in this Complaint, Fong was promoted to the rank of Captain. Although this promotion postdates Kelley's injuries and is not alleged to have caused them, it is alleged as further evidence that the custom, practice, and policy of ratifying and rewarding the

---

[7] https://iowacapitaldispatch.com/2020/07/03/a-des-moines-police-sergeant-has-a-history-of-excessive-force-protesters-ask-why-is-he-still-there/

[8] https://www.desmoinesregister.com/story/news/crime-and-courts/2019/12/17/des-moines-police-sergeant-greg-wessels-accused-excessive-force-against-student-lawsuit-dart-dmps/2643088001/

unconstitutional use of force described herein was in effect before, on, and after October 9, 2024, and remains in effect today.

148. Upon information and belief, following the incident described in this Complaint, the Des Moines Police Department reviewed the force used against Kelley and determined that it was consistent with Department policy and training, and imposed no discipline upon any of the Defendant Officers.

149. The City's determination that the force used against Kelley was within policy, and its failure to discipline any of the Defendant Officers, constitutes ratification of the unconstitutional conduct alleged herein.

**Failure to Train, Supervise, and Discipline**

150. Des Moines failed to adequately train its officers regarding the constitutional limits on the use of force and, in particular, regarding the obligation to cease, disengage, or call off force once an arrestee has surrendered and ceased resisting, with deliberate indifference to the known or obvious consequences of that failure. *City of Canton v. Harris*, 489 U.S. 378 (1989).

151. Upon information and belief, Des Moines failed to adequately train its certified canine handlers, including Tiller, regarding: (a) the circumstances under which a police service dog may lawfully be deployed to bite a person; (b) the requirement that a feasible warning be given before a police service dog is deployed; (c) the obligation to call off and secure the release of a police service dog immediately upon an arrestee's surrender or cessation of resistance; and (d) the maintenance of

adequate control over a police service dog deployed at close quarters among other officers.

152. The inadequacy of the City's canine training and control is evidenced by the fact that Draco bit Officer Ladd during the same deployment, and by Tiller's inability to secure Draco's release by command, requiring Tiller instead to physically pry the dog's jaws from Kelley's leg.

153. Upon information and belief, the City of Des Moines maintained no adequate written policy governing the call-off, release, and post-surrender disengagement of police service dogs, or maintained such a policy but failed to train or supervise its officers in its application.

154. Des Moines failed to adequately supervise and discipline its officers who used force against surrendered, compliant, or restrained arrestees, thereby ratifying, encouraging, and tolerating such unconstitutional conduct.

155. The need for more or different training, supervision, and discipline was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of Des Moines can reasonably be said to have been deliberately indifferent to that need.

156. The existence of the custom and practice alleged herein, and the officers' understanding of it as the Department's expectation, is further demonstrated by the Defendant Officers' own contemporaneous recounting of the incident of their laughter, their boasting, and their express statement that the incident would serve

as a positive teaching example for young officers in field training on how the Des Moines Police Department expects its officers to employ force.

157. The policies, customs, practices, and failures of Des Moines described herein were the moving force behind, and the direct and proximate cause of, the deprivation of Kelley's constitutional rights and the resulting damages set forth above.

158. Kelley seeks compensatory damages against Des Moines, together with reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988(b). Kelley does not seek punitive damages against the City of Des Moines.

**DIVISION VI**
**Assault and Battery**
**Defendants Tiller, Minnehan, Ladd, Pottorff, and City of Des Moines**

159. Kelley incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

160. The Defendant Officers intentionally, unlawfully, and without legal justification placed Kelley in reasonable and serious apprehension of imminent harmful and offensive contact with his person, including but not limited to by repeatedly punching him in the back of the head and by directing a police service dog to bite him.

161. The Defendant Officers intentionally and unjustifiably caused, and/or permitted a police service dog to cause, unwanted, harmful, and offensive bodily contact with Kelley, which resulted in physical pain and injury, including the canine bite laceration to his right leg.

162. Pottorff aided, directed, encouraged, and ratified the tortious conduct of Minnehan and Tiller and is jointly and severally liable for the resulting harm.

163. The Defendant Officers' conduct constituted a willful and wanton disregard for the rights and safety of Kelley.

164. Pursuant to Iowa Code § 670.4A, at the time of the conduct described herein, it was clearly established law that a peace officer is privileged to use only such force as the officer reasonably believes to be necessary to effect a lawful arrest, and no more. Iowa Code § 804.8.

165. It was likewise clearly established law that the use or continuation of force, including the deployment or continued application of a police service dog bite, against an arrestee who has surrendered and ceased resisting is not privileged and constitutes assault and battery. *See* Iowa Code § 804.8; *Blazek v. City of Iowa City*, 761 F.3d 920 (8th Cir. 2014); *Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2003) (distinguished by *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007, on issue of municipal liability); *Henderson v. Munn*, 439 F.3d 497 (8th Cir. 2006).

166. The facts supporting Kelley's claim that the foregoing rights were clearly established are pleaded with particularity in the Factual Allegations and Law Common to All Counts sections above, and include the specific timestamps, duration, and sequence of the force applied to Kelley after his surrender.

167. Accordingly, the Defendant Officers are not entitled to qualified immunity under Iowa Code § 670.4A on Kelley's claims for assault and battery.

168. As a direct and proximate result of the Defendant Officers' conduct, Kelley suffered the damages set forth above, justifying an award of compensatory damages against each of the Defendant Officers.

169. The Defendant Officers' conduct constituted willful and wanton disregard for the rights and safety of Kelley and was undertaken with actual or legal malice, justifying an award of punitive damages against each of the Defendant Officers pursuant to Iowa Code § 668A.1.

170. Pursuant to the doctrine of *respondeat superior* and Iowa Code Chapter 670, Defendant City of Des Moines is liable for the compensatory damages caused by the wrongful acts and omissions of its employees, the Defendant Officers, committed within the scope of their employment. Iowa Code § 670.2.

171. No exemption set forth in Iowa Code § 670.4 applies to the intentional tortious conduct alleged in this Division.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff Eric Lee Kelley respectfully requests judgment against the Defendants as follows:

- Compensatory and actual damages as to all Defendants in a fair and reasonable amount to be determined by the trier of fact;
- Punitive damages as to Defendants Tiller, Minnehan, Ladd, and Pottorff;
- Nominal damages in the alternative, as to Defendants Tiller, Minnehan, Ladd, and Pottorff;
- Reasonable attorney fees and costs, including pursuant to 42 U.S.C. § 1988(b);
- Pre-judgment and post-judgment interest as allowed by law; and

- Such other and further relief as the Court deems just and equitable in the premises.

**JURY DEMAND**

Plaintiff, Eric Lee Kelley, hereby demands a trial by jury as to all claims and issues stated in this Complaint, pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully Submitted,

/s/ *Robert G. Rehkemper*

_______________________________

Robert G. Rehkemper, AT0006553
GOURLEY, REHKEMPER & LINDHOLM, PLC
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Telephone: (515) 226-0500
Email: rgrehkemper@grllaw.com
**ATTORNEY FOR PLAINTIFF**

Original filed via CM/ECF.